IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PAMELA JEAN SORNSON,

               Plaintiff,

     v.

OREGON COMMISSION ON CHILDREN
and FAMILIES, et al.,

               Defendants.

No. 03:12-cv-00190-HZ

OPINION & ORDER

Linda L. Marshall
PMB 408
3 Monroe Parkway, Suite P
Lake Oswego, OR 97035

       Attorney for Plaintiff

Marc Abrams
OREGON DEPARTMENT OF JUSTICE
1515 SW Fifth Avenue, Suite 410
Portland, OR 97201

       Attorney for Defendants

HERNANDEZ, District Judge:

Pamela Sornson brings this action against the Oregon Commission on Children and Families[1] ("OCCF"), Marion County, CASA of Marion County, Inc. ("MCASA"), and Mickey Lansing (collectively "Defendants") pursuant to 42 U.S.C. § 1983. Ms. Sornson alleges discrimination and retaliation in violation of her First Amendment right to free speech. Now before the Court is Ms. Lansing's motion for summary judgment (Dkt. #40). For the reasons that follow, Ms. Lansing's motion for summary judgment is GRANTED.[2]

## BACKGROUND

MCASA is a non-profit organization that provides Court Appointed Special Advocates who represent children during court proceedings. Sornson Decl., ¶ 10; Abrams Decl, Ex. A, pp. 2-3. MCASA operates exclusively within Marion County, Oregon, and receives its funding from Marion County. Sornson Decl., ¶¶ 10, 14. Marion County in turn receives its funding for CASA programs from state and federal funds, allocated by and distributed through OCCF. Id. Ms. Sornson served as the Executive Director of MCASA, beginning July 1, 2005, until March 15, 2011. Id., ¶ 10; Abrams Decl., Ex. A, p. 2:19. Ms. Lansing was the Executive Director of the now defunct OCCF. Sornson Decl., ¶¶ 8, 11. Ms. Lansing had no authority over Ms. Sornson as her employer, nor did Ms. Lansing serve on MCASA's board.

Ms. Sornson alleges that in the summer of 2010, she discovered "OCCF was seriously misallocating . . . funds." Abrams Decl., Ex. A, p. 5:10-24. At the same time, Ms. Sornson alleges she was asked to revive the Oregon CASA Association ("OCASAA"). Sornson Decl., ¶¶ 16-17. After reviving OCASAA, Ms. Sornson seated a board of her choosing, which consisted

---

[1] I dismissed OCCF from the case on August, 13, 2012.
[2] In her reply, Ms. Lansing raises evidentiary objections to Ms. Sornson's exhibits on the grounds of relevancy and authentication. For the purposes of this motion, I considered all the evidence submitted. Because the evidence submitted by Ms. Sornson fails to create a genuine issue of material fact as to the claims against Ms. Lansing, the evidentiary objections are moot.

of, among others, Representative Jim Thompson. Id., ¶ 18. Ms. Sornson and the new OCASAA began lobbying the Oregon legislature to "transfer CASA programs and funding from the OCCF to the Oregon Judicial Department." Id., ¶ 19. On January 7, 2011, the National CASA Association contacted OCASAA notifying OCASAA that it was infringing on the CASA trademark. Id., ¶ 34. Shortly thereafter, OCASAA changed the organization's name to Child Advocates of Oregon ("CAO"). Id.

On February 14, 2011, Alison Kelley, Director of Marion County Children and Families Department, sent a letter to the MCASA board ("Board") notifying them that she had been directed to review MCASA's compliance with the terms of its contract with Marion County. Id., Ex. 17. After receiving information from MCASA, Ms. Kelley sent a follow-up letter on February 28, 2011, documenting her findings, and concluding that MCASA was in breach of its contract with Marion County. Id., Ex. 22. On March 15, 2011, the Board, consisting in part of Irene Trent-Valencia, President, Jim Lewis, Treasurer, and Kimberley Eve, Secretary, asked for Ms. Sornson's resignation. Id., Ex. 25. Ms. Sornson declined to resign and the Board terminated her. Id., ¶ 57.

As a result of Ms. Sornson's activities with OCASAA, she alleges that Ms. Lansing "organize[d] to chill the legislative agenda of Sornson and [OCASAA]." Resp., p. 8. Ms. Sornson asserts Ms. Lansing furthered this goal by meeting with legislators, contacting the Attorney General's office, and taking action that triggered scrutiny of MCASA by the National CASA and Marion County. Sornson Decl., ¶¶ 22, 27, 29, 47-49, 51-53. She further claims that Ms. Lansing's actions resulted in her termination. Resp., p. 35.

/ / /

/ / /

**STANDARD**

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting former Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28 (9th Cir. 2009) (internal quotation marks omitted). The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial. Bias v. Moynihan, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing Celotex, 477 U.S. at 324).

The substantive law governing a claim determines whether a fact is material. Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009). The court draws inferences from the facts in the light most favorable to the nonmoving party. Earl v. Nielsen Media Research, Inc., 658 F.3d 1108, 1112 (9th Cir. 2011).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

/ / /

**DISCUSSION**

I.    **First Amendment Retaliation**

Section 1983 provides that:

> every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law . . .

42 U.S.C. § 1983 (2006).  Although Section 1983 provides a direct cause of action for First Amendment violations, it does not impose respondeat superior liability.  See Ashcroft v. Iqbal, 556 U.S. 662, 677 (2009) ("In a § 1983 suit[,] . . . each Government official . . . is only liable for his or her own misconduct."); Rise v. Oregon, 59 F.3d 1556, 1563 (9th Cir. 1995) ("[S]tate officials are subject to suit under section 1983 only if they play an affirmative part in the alleged deprivation of constitutional rights.") (Internal quotations omitted).  In other words, Section 1983 permits only direct claims against an individual.

Ms. Lansing argues the Court should grant her motion because Ms. Sornson cannot establish that Ms. Lansing violated her First Amendment rights.  To establish a First Amendment violation, a court applies a five-step series of questions.  Eng v. Cooley, 552 F.3d 1062, 1070 (9th Cir. 2009).  These questions ask:

> (1) whether the plaintiff spoke on a matter of public concern; (2) whether the plaintiff spoke as a private citizen or public employee; (3) whether the plaintiff's protected speech was a substantial or motivating factor in the adverse employment action; (4) whether the state had an adequate justification for treating the employee differently from other members of the general public; and (5) whether the state would have taken the adverse employment action even absent the protected speech.

Id.

/ / /

/ / /

5 - OPINION & ORDER

### A.      Public Concern

Neither Ms. Lansing nor Ms. Sornson dispute Ms. Sornson spoke on a matter of public concern.  Mot. Summ. J., p. 9; Resp., p. 20.  Therefore this factor is not at issue for purposes of this motion.

### B.      Whether Plaintiff Spoke as a Private Citizen

Ms. Lansing contends Ms. Sornson did not speak as a private citizen because lobbying was a function of her position as Executive Director.  Abrams Decl., Ex. A, p. 55:1-23; M. Summ. J., p. 9.  A public employee's speech within the employee's official duties is generally not protected.  See Garcetti v. Ceballos, 547 U.S. 410, 426 (2006) ("We reject . . . the notion that the First Amendment shields from discipline the expressions employees make pursuant to their professional duties.").  Whether speech is within an employee's job responsibilities is a question of fact and a court "must assume the truth of the facts as alleged by plaintiff with respect to employment responsibilities." Eng., 552 F.3d at 1071.  Ms. Sornson asserts she spoke as a private citizen and not on behalf of MCASA.  Sornson Decl., ¶ 19.  Ms. Lansing argues that Ms. Sornson did not speak as a private citizen because she represented herself as President of OCASAA and because  lobbying was a function of her position with MCASA.  Reply., p. 12. Based on the evidence above, I concluded there is a triable issue of fact as to whether Ms. Sornson spoke as a private citizen in this instance.

### C.      Speech as a Substantial or Motivating Factor in the Adverse Action

Ms. Sornson contends Ms. Lansing conspired against her which resulted in her termination by the Board.  Whether a plaintiff's protected speech is a substantial or motivating factor is a question of fact.  Eng, 552 F.3d at 1070.  "Plaintiff bears the burden of showing the state 'took adverse employment action[.]'" Id. (citation omitted). "Conspiracy is not an

independent claim for relief, but helps to connect the actions of multiple defendants." Lacey v. Maricopa Cnty., 693 F.3d 896, 934 n.19 (9th Cir. 2012). The Complaint, however, must "give detail[s] . . . sufficient to preserve the issue in this case." Id. Here, Ms. Sornson does not allege conspiracy in her Complaint. Reply, p. 11. Rather, Ms. Sornson only raises conspiracy in her response. Ms. Sornson's conspiracy theory fails on that basis alone.

**1. Defendant's Alleged Interagency Actions**

Even if Ms. Sornson had properly alleged conspiracy in her Complaint, that claim would still fail. A civil conspiracy may exist where "a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir. 1999) (quoting Vieux v. E. Bay Reg'l Park Dist., 906 F.2d 1330, 1343 (9th Cir. 1990)). Co-conspirators must "reach[] a unity of purpose . . . or a meeting of the minds in an unlawful arrangement." Id. (quoting United Steelworkers of Am. v. Phelps Dodge Corp., 865 F.2d 1539, 1541 (9th Cir. 1989)).

Ms. Sornson cites numerous instances where she purports to show that Ms. Lansing's involvement amounts to concerted action intended to accomplish an unlawful objective. For example, Ms. Sornson alleges Ms. Lansing participated in a series of conference calls beginning on December 10, 2010, for purposes of "explor[ing] potential responses to Sornson's legislative activities." Resp., p. 21. In support, Ms. Sornson introduces into evidence one page of handwritten notes and an email authored by Pam Fortier, Executive Director of CASA of Central Oregon. Sornson Decl., Ex. 6-7. Additionally, she introduces subsequent emails authored by Ms. Fortier, as well as Michael Heaton, Regional Director of the National CASA Association. Id., Ex. 8-9.

The numerous documents and emails that Ms. Sornson submits do not support her theory that Ms. Lansing conspired against her. For example, Ms. Sornson does not provide any evidence regarding the contents of the teleconference on December 10, 2010. The handwritten notes do not indicate who authored the notes, nor do they indicate that they were taken as part of the teleconference. Id., Ex. 6.

The emails following the December 10, 2010, teleconference do not detail the conversation Ms. Sornson alleges took place. Rather, the emails only show that the conference call participants "discussed the need to review agency assigned tasks and outcomes of agency follow up." Id., Ex. 7. None of the emails submitted in support of Ms. Sornson's conspiracy theory were even authored by Ms. Lansing, but were instead only received by Ms. Lansing.

In addition, absent from the record is any correspondence between Ms. Lansing and the Attorney General. Ms. Sornson asserts "Lansing assigned her subordinates Marsha Clark and Iris Bell to be the points of contact with the AG's office." Resp., p. 24. Ms. Sornson, however, provides no evidence demonstrating that Ms. Lansing directed Ms. Clark and Ms. Bell to contact the Attorney General. Rather, she relies solely on the fact that Ms. Clark and Ms. Bell were Ms. Lansing's subordinates. Id., p. 9. As stated above, Section 1983 does not support respondeat superior liability. Accordingly, to the extent Ms. Sornson asserts Ms. Lansing is liable for the acts of Ms. Clark and Ms. Bell because they were her subordinates, such assertions do not support a Section 1983 claim against Ms. Lansing.

Furthermore, none of the evidence establishes any unlawful objective by Ms. Lansing. A civil conspiracy requires "some unlawful objective for the purposes of harming another[.]" Gilbrook, 177 F.3d at 856. At most, the other evidence proffered by Ms. Sornson simply

demonstrates Ms. Lansing was concerned about Ms. Sornson's noncompliance with the contract between MCASA and Marion County.

### 2. Defendant's Interactions with Legislators

Ms. Sornson argues Ms. Lansing's conspiracy chilled her speech by "disparag[ing] her with legislators." Resp., p. 28. Specifically, Ms. Sornson asserts Ms. Lansing met with three legislators for this purpose. Id., p. 29. In support of her argument, Ms. Sornson offers a conversation between Ms. Lansing, Ms. Clark, and Senator Jacki Winters. Id. She asserts that during this conversation Ms. Lansing provided Senator Winters with "misleading and/or derogatory [information.]" Id. Ms. Sornson misrepresents the evidence. In her deposition testimony, Ms. Lansing merely acknowledged that she provided Senator Winters with "a copy of the Secretary of State's filings . . . [t]o give her information based on the questions she was asking about . . . what the issue was [] between the directors [sic] network and Ms. Sornson." Sornson Decl., Ex. 1, pp. 8:17-9:22. Ms. Sornson fails to explain how Secretary of State filings are disparaging. Senator Winters herself stated she had never heard anyone state Ms. Sornson forged documents or acted inappropriately with OCASAA. Abrams Decl., Ex. D, pp. 2:2-3:1.

Ms. Sornson next offers a conversation Ms. Lansing had with Senator Courtney on January 20, 2011,[3] just prior to the Senator's meeting with Ms. Sornson. As a result of Ms. Lansing's earlier meeting, Ms. Sornson asserts that Senator Courtney was agitated. Ms. Sornson argues this encounter with the agitated Senator led her to "stop[] contacting legislators for the time being." Resp., p. 30. Ms. Sornson, however, proffers no evidence of the conversation that Ms. Lansing had with Senator Courtney. Indeed Ms. Sornson does not even depose Senator Courtney. Rather, Ms. Sornson simply argues the proximity between Ms. Lansing and Ms.

---

[3] Ms. Sornson incorrectly refers to the date in her Declaration as January 20, 2010. The deposition testimony of Ms. Lansing states that the meeting occurred during the 2011 legislative session.

Sornson's meetings with Senator Courtney could allow a jury to "infer that the action took place because of the protected activity." Id.

Ms. Sornson's reliance on proximity in time is misplaced. In evaluating whether speech was a substantial or motivating factor behind an adverse employment action, "a specified time period cannot be a mechanically applied criterion." Coszalter v. City of Salem, 320 F.3d 968, 977 (9th Cir. 2003). "Whether an adverse employment action is intended to be retaliatory is a question of fact that must be decided in the light of the timing and the surrounding circumstances." Id. at 978. Here, Ms. Sornson fails to show surrounding circumstances supporting her conclusion. Ms. Sornson provides no evidence of the content of the conversations with legislators. Rather, the evidence proffered by Ms. Sornson shows Ms. Lansing disagreed only with Ms. Sornson's legislative agenda. Like Ms. Sornson, the First Amendment protects Ms. Lansing's right to voice her position with the legislature. Because Ms. Sornson has not demonstrated the content of the conversations nor other surrounding circumstances which support her proximity argument, her reliance on timing alone is unpersuasive.

Finally, Ms. Sornson asserts that during a meeting with Representative Thompson, Ms. Lansing presented him with a document that "contained many misleading and false aspersions to Sornson." Resp., p. 30. In support, she cites the deposition of James Williams, a legislative aid to Representative Thompson. In his deposition Mr. Williams opined "[k]nowing all of the background of the legislation and the pros and cons . . . it was very negative, casting disparaging remarks or insinuations." Sornson Decl., Ex. 4, pp. 20:23-21:1. Ms. Sornson asserts Ms. Lansing presented a negative document to Representative Thompson. Ms. Sornson, however, fails to establish how Ms. Lansing violated her constitutional right to free speech where Ms. Lansing was never Ms. Sornson's employer. See Coszalter, 320 F.3d at 976 (An adverse

employment action is one "reasonably likely to deter employees from engaging in protected activity[.]").

Finally, Ms. Sornson argues that Ms. Lansing chilled her free speech rights by restricting her lobbying activities.  In support of this argument, Ms. Sornson proffers evidence showing that in mid-February Ms. Trent-Valencia and two other MCASA board members asked her to stop meeting with legislators.  Sornson Decl., ¶ 18.  The evidence here simply shows that Ms. Lansing was concerned about MCASA's compliance.  Additionally, Ms. Sornson admits at the time the Board asked her to stop lobbying the legislature, she had already done so because of her fear of Senator Courtney.  Id., ¶ 42.  Further, there is no evidence showing Ms. Lansing controlled the Board in such a way that the Board was involved in any alleged conspiracy with Ms. Lansing, let alone that their action to terminate Ms. Sornson was in fact Ms. Lansing's decision.  Neither party disputes that MCASA, a private non-profit organization, employed Ms. Sornson. Id., ¶ 10; Abrams Decl, Ex. A, pp. 2-3; Mot. Summ. J., p. 10.  It is also undisputed that OCCF, Ms. Lansing's employer, is a separate, state-run organization.  Sornson Decl., ¶¶ 11, 14

As stated above, there are no facts linking Ms. Lansing's alleged activities with the decision of the Board or that Ms. Lansing exercised any direct control over the Board.  The deposition testimony of Ms. Irene Trent-Valencia, President of the Board, demonstrates an absence of communication between Ms. Lansing and the Board.  Id., Ex. 3.  When asked whether she felt "pushed into [the] decision" to terminate Ms. Sornson by either Marion County or OCCF, Ms. Trent-Valencia replied "[n]ot at all."  Id., Ex. 3, p. 14.  Additionally, Ms. Sornson presents no evidence showing Ms. Lansing ever communicated with other Board members, including those members who signed her termination letter, namely Jim Lewis and Kimberley

Eve. Id., Ex. 25, p. 3. Simply stated, Ms. Sornson fails to present evidence demonstrating that Ms. Lansing, and not the Board, terminated her.

Lacking any direct contact between the Board and Ms. Lansing, Ms. Sornson next relies on inferences that Ms. Lansing acted adversely through her governmental colleagues. For example, Ms. Sornson submits a letter dated February 28, 2011, from the Director of the Marion County Children and Families Commission, Alison Kelley, to Ms. Trent-Valencia. Id., Ex. 22. In the letter, Ms. Kelley details numerous deficiencies in MCASA's operations, such as "acting outside the scope of their responsibility . . . adopt[ing] an adversarial attitude toward DHS . . . [and] not [] operating according to the court's expectations." Id., Ex. 22, pp. 1-3. However, Ms. Kelley is not a subordinate of Ms. Lansing, nor is there evidence Ms. Lansing and Ms. Kelley ever directly communicated about Ms. Sornson's lobbying efforts. Even when viewing the evidence in the light most favorable to Ms. Sornson, it does not support the conclusion that Ms. Lansing violated Ms. Sornson's constitutional rights. In sum, Ms. Sornson fails to present any evidence that Ms. Lansing played an affirmative part in her termination.

### D.    Justification and Whether the State Would Have Taken the Adverse Action

As shown above, Ms. Sornson has not met her burden of satisfying the third factor from Eng. Therefore, I need not reach factors four and five, which places the burden on the government to show that a "legitimate administrative interest[] outweigh[s] the employee's First Amendment rights," and asks "whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public[,] and whether the state would have taken the adverse employment action even absent the protected speech." Eng, 552 F.3d at 1071 (citations omitted).

/ / /

**II.      Qualified Immunity**

Having concluded that Ms. Sornson fails to raise a triable issue of fact that Ms. Lansing

violated her free speech rights, I need not reach the issue of qualified immunity.  Accordingly,

the issue of qualified immunity is moot.

**III.     Attorney Fees and Costs**

Ms. Lansing argues that in she is entitled to an award of attorney fees and costs should

she prevail on summary judgment.  Attorney fees and costs are available under 42 U.S.C. § 1988

to the prevailing party in a § 1983 claim "in [the court's] discretion."  42 U.S.C. § 1988(b)

(2006).   Fees may be awarded "where the action brought is found to be unreasonable, frivolous,

meritless or vexatious." Roberts v. Spalding, 783 F.2d 867, 874 (9th Cir. 1986) (citation

omitted).  While insufficient to present a triable issue of fact, I do not find Ms. Sornson's claims

to be so unreasonable, frivolous, meritless or vexatious or brought in bad faith as to justify an

award of costs and fees.[4]  Ms. Lansing is not entitled to attorney fees and costs.

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[4] Ms. Lansing also seeks leave to amend her Answer, citing Rule 15(a)(2).  Ms. Lansing's
motion for leave to amend violates Local Rule 7-1(b), which states that a motion "may not be
combined with any response, reply, or other pleading."  LR 7-1(b).  Because Ms. Lansing's
request for leave to amend is combined with her motion for summary judgment, it is
procedurally improper under the local rules.

**CONCLUSION**

Based on the foregoing, Ms. Lansing's motion for summary judgment [Dkt. #40] is

granted.  IT IS SO ORDERED.


Dated this _____ day of July, 2013.


_____
MARCO A. HERNANDEZ
United States District Judge